11-930, Josh C. Tunja, M.D. v. Thomas, 18-year-old, M.D. Counsel, if both of you would step up and identify yourselves for the record. Good morning, Justices. Chris Cosentino on behalf of the plaintiff, Thomas C. Tunja. Hugh Griffin on behalf of the defendant, Alpha Lee, Dr. Painter, which brings me to an error in my casting. Dr. Conway should be listed as a defendant for this appeal. He's not involved in the appeal itself. All right. Mr. Cosentino and Mr. Griffin, you know the routine. I mean, you've heard that we will allow each of you approximately 15 minutes to present your arguments. And from that, Mr. Cosentino, you can save time for rebuttal. Thank you. Thank you, Your Honor. May I reserve time now in advance? Yes. Thank you. Good morning. May it please the Court, my name is Chris Cosentino. I'm here on behalf of the plaintiff's appellants, Dr. Josh C. Tunja and the incident matter. We're here before the Court because we believe that the trial court made an error in granting summary judgment on the issue of a violation of the Methodist Studies Act by Dr. Thomas Painter, as alleged by Dr. Josh C. Tunja. We're here seeking relief and we're seeking findings by the Court. First, with respect to the fact that we believe there is a material issue of fact as to whether or not the allegations made by Dr. Tunja against Dr. Painter equate with his violation of the Methodist Studies Act by questioning somebody outside of the peer review process. Secondly, we're asking the Court to find that there is, in fact, a private right of action that Dr. Tunja enjoys to bring this case against Dr. Painter. Where is it under the Medical Study Act that there is a private right? There is no private right found in the Act. We're asking the Court to rely on Supreme Court precedent and the four factors that are laid out in the brief, and then I'd be happy to go through with the Court this morning and find a private right, because we think that it's necessary to protect somebody like Dr. Tunja who's intended to be protected under the Act. All right. What about his injury, though? Was that supposed to be protected under the Act, too? I mean, the slander. This is supposed to be for peer review. Correct. The Act is intended to protect the open exchange of information between doctors. The Act does not differentiate between doctors who sit on the committee in review of the doctors who are being reviewed or the doctors who are being reviewed. So we believe that the Act serves essentially two functions, or there's two protected classes. One, we believe, is the general public, because we believe that the Medical Studies Act was first and foremost crafted to ensure that quality medical care gets delivered, and that gets delivered by a way of self-analysis that these doctors conduct. Secondly, and almost as importantly, we think that the doctors involved in the peer review are protected as well. But when did the peer review actually start? You said as soon as he went in for the operation. That is correct, and that's based on Dr. Painter's deposition testimony. But what about Dr. Tunja, Your Honor? Didn't he, in his deposition, indicate that there was no process at the time the comments were made? That was Dr. Tunja's belief. Dr. Tunja is not a member of a peer review committee, nor has he ever been, to my knowledge. Dr. Painter is a member of the Surgical Quality Control Committee. He was in a position to know when peer review began, and he testified to that. But doesn't the Supreme Court case first talked about this, suggest that there is a beginning period and there is an end period of peer review? The problem, I think, Judge, with taking that position, Justice, excuse me, is the fact that I don't think each hospital has a, I'm sorry, I don't think all hospitals have a uniform standard with respect to peer review, to when the process begins and when it ends. And I think that's a fair statement. Dr. Painter's testimony was, in our hospital, at Northwest Community Hospital, there are cases that are automatically pulled and sent to peer review. Such cases would include, as was the case here, an immediate return to surgery. So the minute Dr. Painter was called in for this emergency procedure, hours after Dr. Tunja performed his procedure, he knew as a member of the quality control, the peer review committee, this was a case that was already pulled. It was already automatically flagged. Well, just because it was flagged, does that necessarily mean that the peer review process had started? Or does that imply that the peer review process will at some point begin? I mean, you're talking about a doctor coming in an emergency situation and having his hands on the patient. Do you think that it's justifiable to say that at that moment, while he's working on the patient, that the peer review process has started? I think that's fair. Or is the opposite view, that he knows in his mind that at some point in time, there will be a peer review process for this instance? I think that's a very fair question. And what I would do is I would point the Court's attention to page 834, the appendix of our brief, which indicates it's the attachment of the deposition transcript of Dr. Painter, in which he goes to great length to describe when he believes the peer review process began. He says, contrary to what is alleged in the response brief, it doesn't begin when the committee beats. In a case like this, he refers to the... But when does it begin? It begins, in this case, it begins when the, I can't remember the title of the woman to whom we refer, the committee secretary, I believe, is how we refer to her in this deposition. She pulls the file automatically when there is a return to surgery. So to answer your question, I think that the peer review process perhaps didn't begin when he had his hands on the patient, Dr. Painter, but sometimes shortly thereafter, and certainly before he has this conversation with Dr. McGillin. Doesn't the actual name peer review suggest something? Doesn't it suggest that there are peers and that they are going to be reviewing? I mean, how do we have that going on? We have one doctor making a statement that someone had to be brought back in immediately, but where do we have the process of peers here? Just because this doctor happens to be someone that's going to be on the committee or not? Well, the Roche Court, I believe, Your Honor, clearly laid out the fact that peer review encompasses more than just the meeting of the doctor. Yes. It involves the investigatory process leading up to the meeting itself. It's our position that Dr. Painter, as somebody who was a member of that committee, was clearly aware of the fact that peer review in a case like this, it's an automatic flag for peer review when there's a return to surgery. But the statements that the doctor made, they weren't even used by the peer review committee. They weren't incorporated in it. That's correct, Your Honor. But the statements that he made to Dr. McGillin with regard to the alleged negligent cutting of his artery by Dr. Tunja, those were brought up before the peer review committee. That was the reason that the peer review committee was convened. And they found that it wasn't. Dr. Painter's testimony was a little unclear of that. Dr. Painter, I believe, said that we convened the meeting because Dr. Tunja was not actively participating in the peer review committee meeting. There was never a second meeting, I believe, that was called. And to our knowledge, the matter was dropped thereafter. I don't know that there was ever a formal finding that there was never a negligent cutting of the artery. Wasn't there really no finding at all? Because there was one meeting, and it was over, and then your client said he never heard anything further about it. That's true. That's correct. I want to back up for one second. Sure. Do you agree that if we conclude that the peer review process was not ongoing at the moment that the patient had to go back in, do you agree that we don't need to reach this issue of a private right? I think that would probably be a fair statement, Your Honor. And don't you think that in most every case there's already a right of action at the common law? What would be the reason or the need for this right that you're suggesting?  The first and primary issue is was this comment made during the peer review process? I'd actually like to go back to the information in question because it's the information that is supposed to not be transmitted outside the peer review process. Is the information that you're complaining about the information that he garnered during his procedure, or is it the information that he got from the pathologist? Because he went in and talked to his superior, Dr. I'm sorry, what's his name? McGillan. McGillan, thank you. He went in and talked to Dr. McGillan and transmitted certain information to Dr. McGillan. Dr. McGillan was not on the peer review committee. So my question is what information is it that you're complaining about that should not have been transmitted to Dr. McGillan? Primarily it's the information, well, it's both. It's the information that he gained by the surgery itself, but it's also the information that he gained. He alleges that he had a conversation with the pathologist, Dr. Kern, at some point, and then he has a conversation with Dr. McGillan thereafter. Dr. Kern allegedly raises the idea that there might have been in the specimen, in the pathology specimen, this artery. He then brings that to Dr. McGillan. It isn't really that at the beginning. How can we determine that that wasn't, in fact, what began the peer review process? Not the comment that was made initially, but this information that Dr. Painter received from the pathologist. If that's the case, then the peer review process had begun, Your Honor, and then he went to talk to Dr. McGillan. No, it hadn't begun until he spoke with the pathologist. That was a couple of weeks later, wasn't it? No, he spoke with the pathologist, I believe, and I'm looking for the statement of facts. I think it was four or five days later. Right, and then he had a conversation with Dr. McGillan thereafter. So if the timeline holds, then the peer review process had begun. Wasn't there a comment made that very day? Isn't that what you're complaining about, or you're complaining about the second? The comment that was made to Dr. McGillan, I'm not sure what the timeline in relation to the actual event was, but according to the statement of facts in the response brief, it appears as if Dr. Painter alleges, and this is consistent with his deposition testimony, he received a call from the pathologist with this information, and then he goes to talk to Dr. McGillan. If that's the case, and if peer review began when he got the information from the pathologist, then he took the information to somebody who was not connected to peer review. So that was a breach of the confidentiality. All right, so I think, Mr. Cosentino, you should clear up for us the time frame that you're referring to. What is the statement that you are basing your appeal on, and when did it take place? The statement that Dr. Painter made to Dr. McGillan is what this appeal was based on. And that was after the day of the surgery? It was after the day of the surgery, and it was after the day of his conversation with the pathologist. And what were the contents of the conversation? I'll strike that. Dr. Painter has a conversation with Dr. McGillan somewhere in the hospital. He was the medical director. He's a staff member, but he's not a member of peer review. And he says to Dr. McGillan, we had a return to surgery. I performed a procedure of femoral bypass on a patient of Dr. Tunja's. Oh, and I had a conversation with Dr. Kern. She called me up at home and told me that the pathology specimen revealed something interesting, potentially something interesting. And this tells Dr. McGillan that, and the clear implication is that Dr. Tunja severed this artery, and that's why it was found in the pathology specimen. That's the type of information that should remain sacrosanct. It should remain within the confines of peer review and be shared only with peer review committee members. It wasn't in this case, and that's what we're complaining about.  Anything you want to add at this time, Mr. Cosentino? So I just want to make sure. It's your position that because of the existence of this act, that when Dr. Kern gives Dr. Painter this information, that information has to stop with Dr. Painter and can't go to anyone else that's not within the peer review system. So you can't go to his superior, the chairman of the hospital or whatever, and say, oh, by the way, I learned this from Dr. Painter. That's correct, Your Honor. And I think that that's clear from the holdings from both the Illinois Supreme Court and also from the First District that are cited in our brief. I believe it was in the Roach case, for example, the doctor at issue who was gathering up information, he was the chair of the anesthesia department. He was gathering up information. That information was later found to be not protected because he was in no way, shape, or form connected to peer review. Our concern, our overarching concern should be this. God forbid something happens and... Well, is Dr. Kern somehow connected with peer review? Dr. Kern, no. Dr. Kern is not connected with peer review. But if the court takes the position that peer review began at the moment the pathologist calls something, raises something to the attention of a peer review committee member, in this case Dr. Painter, then sharing anything beyond that point, beyond the sharing of information between Dr. Kern and Dr. Painter, would be violative of the act if the person was not on peer review itself. Go ahead. Wouldn't that defeat the whole purpose of this act, what you're proposing, that any statement made at any time should be privileged and there really wouldn't be this even beginning of whether or not a peer review process should commence? And wouldn't that have a chilling effect on every procedure and every surgery and anything else that happens in the hospital? I mean, what is the point of the Medical Studies Act? The point of the Medical Studies Act is to, again, foster open communication between peers with respect to medical treatment to improve that treatment for the betterment of the public. In this case, and I'm not necessarily disagreeing with your premise, but I think there's a problem. The problem is this. In this case, if Dr. Tunja were sued by the patient's family, the information that Dr. Painter shared with Dr. McGillen would not be privileged. That's clear under the holdings in Roche, Berry v. West Suburban Hospital. In all of those cases, you've got information that is shared with or generated by members of a medical staff not on peer review that is open to plaintiffs in medical malpractice cases. And if the act is designed to protect that information, if we want to foster the open communication, then that information should stay within the confines of peer review. The minute it goes outside those confines, it becomes fodder for plaintiffs in med mal cases. So that's what the real concern is. The statute, if you skip that whole ten-line list of organizations, the statute says all information used in the course of internal quality control or medical study or for improving patient care. So my question is, doesn't that bring us to an important question? And that is, what is the purpose of Dr. Kern's telephone call to Dr. Painter? Is the purpose of Dr. Kern's telephone call to Dr. Painter in the course of or is it for some other purpose? Because I think that's an important question right there. What's the purpose of the call? Or am I asking the wrong question? I don't know. I think assuming that the call was in furtherance of the purposes set forth in the act, we can assume for argument's sake that that started the ball rolling in quality control. I think that that phone call would, in fact, be privileged. I think once peer review starts, if we're going to say that peer review started at that point, once peer review starts, then any information sharing beyond that point, even if it's going back to Dr. Kern, unless it's summoning Dr. Kern into the committee to hear testimony with respect to what she saw in the specimen, anything other than that would not be privileged. And that's why the conversation with Dr. McGill is problematic. Because if the information comes in that starts the peer review process rolling and then a member of the committee goes outside of the committee to have a discussion with someone else. Well, when did this committee peer review thing start rolling? Wasn't it in February the following year, two months later? The committee meeting did not meet for six or seven months later, to be honest with you. The meeting itself did not take place. But, again, the holding of Roche is clear. It's not just the meeting that's covered. It's the investigation and all the information gathered by the committee leading up to the meeting, which is also covered. And what do you have in the record that even suggests remotely that the peer review process had begun? We have Dr. Painter's testimony. That he made a statement? No, that Dr. Painter, as a member of the peer review committee, testified that it was his belief that peer review in this case had begun automatically because this was a return to surgery. Dr. Painter, and, again, we've attached the relevant deposition transcript to Painter's. I agree with the court. Dr. Tunja's understanding of when peer review started is different than that of Dr. Painter. The problem is Dr. Tunja is not a member of the peer review committee. He's in no position to testify as to when or when it didn't begin. Dr. Painter is. But you're saying that there was four or five days after the actual surgery that the record discloses that a peer review committee had undertaken a review of the subject conversation? We believe, based on Dr. Painter's testimony, that that is, in fact, the case. His testimony was that the committee secretary How is Dr. Painter a peer review committee? He's a member. But you're saying a single member actually encompasses a peer review committee undertaking? I don't know. I don't think that the peer review that Dr. Let me back up. I don't think Dr. Painter is the peer review committee. And if I've given that impression, I apologize. I don't think you've given that impression. I just am trying to grasp how a statement by one doctor means that there's a peer review committee in place that has instituted procedures or proceedings, rather, to look into the issue. I believe the testimony of Dr. Painter is clear on the matter. In his deposition, he says, when you have a situation like this, he talks about several different situations, one of which is a death, a fatality, another of which is a case like this where there's no death but a return to surgery. He says there is no discretion involved in whether or not a case is going to get sent up for peer review. Yes, and I think that that's understandable. But does that equate with the peer review process when your own client said that he answered correct to the following question, and it's your allegation that there had been no peer review process instituted into the June 24 surgery at the time Dr. Painter had a conversation with Dr. McGillick? Again, Your Honor, Dr. Tunjian is not a member of the peer review committee. He never has been. He does not know when the peer review process starts and when it doesn't start. Dr. Painter, as a member of this committee at Northwest Community, is in a position, and if you look at page 93 of his deposition. I give you that he was a member of the committee, but how does that transfer into the peer review process? If I could quote from his deposition, page 93, line 17. This is him. This is not me asking the question. This is his answer. Technically speaking, the process of having a case fall out is part of the peer review process, and the review itself that occurs, that causes that to occur. It's technically part of the review process also. He testified earlier that the case automatically falls out when there is a return to surgery. So it's his understanding that because of this return to surgery, the case fell out and peer review began. That's Dr. Painter's testimony. Anything further that you want to? All right. We'll have some time to rebuttal. Mr. Griffin? Thank you. Mr. Griffin, what about this notion that Mr. Cosentino has raised, that when Dr. Painter made these statements, he was a member of the peer review committee that eventually undertook this examination and made those statements at a time when he had conceded that there's no question that there would be a peer review of this particular surgery? Your key words there are there would be. That was the kind of event in the hospital that would eventually result in a peer review process being undertaken. But it's absolutely clear from the record that at the time these statements were made, five days later, there had been no committee, peer review committee convened, no peer review committee to consider it. But it was an automatic review because any time a vascular surgeon has to go in and correct whatever was going on before, that that was an automatic peer review. There would be an automatic peer review committee. There would be. There would be. And there was indeed, wasn't there? Eventually there was. At a point in February. As you said in the Webb case, timing is everything in these cases. The Webb? Yes. Did you say Wick? Webb. Webb. It's Webb versus time. That old phrase, timing is everything. You have to show that the communication you're trying to protect was generated, created, instigated by a committee acting as a committee. And what Dr. Painter said was the reason he went to Dr. McGilligan is he didn't think it was ever going to be a situation that came to the surgical audit committee where he sat. He thought this was going to be something that the OB-GYN committee would undertake. So he had this information from Dr. Kern. He thought the medical director was the proper person to give it to. But all these cases, Justice Palmer, do involve, you know, statements that go to arguably the case and improving morbidity and so forth and so on. But they're not protected. Why? Because it's a timing issue. All these statements that are made before there's actually a committee in place just aren't protected. The Roche, you know, I'm usually on the other side of this. Because I usually, I remember a lot of doctors and physicians. So I, you know, Justice Wilson in the Chicago Trust case, I think, had the best analysis of this. And it's 298-113-406. And the point he made there was because sometimes the hospitals will try to have a preexisting or preordained rule that, hey, if there's a certain event, we're going to review that. So anything communications that occur after that event, we want to consider, we will urge you to consider, Your Honor, that that's protected under the Medical Studies Act. And Justice Wilson said, you know, that would just take the whole act out of play. You can't make a preordained rule that just because an event's going to occur and you're going to review it at some future time, that every communication and every statement that's made before we meet is also protected. And that's really what the argument here is, that because there was going to be peer review at some future time, every statement that's made is protected. And as I say, from the point of view of a malpractice case, where I'm usually on the side of urging the application of the act, in Dr. Painter, what he said was, well, he considers peer review, I mean, from his point of view, peer review is everything, because everything you're doing in the hospital is ultimately subject to peer review. But unfortunately, from the point of view of a defendant defending these cases, the courts have not gone that way in Roche. Well, do Dr. Painter's comments preclude summary judgment? No, not at all. When he said that this was an automatic peer review? It would be an automatic peer review. Do those comments raise the question of the material fact that the statements he made were within the process, the peer review process? No, because the facts are undisputed that the process had not commenced. Well, is there a line here? Are we saying that unless and until there's a meeting of the committee, any statements? There has to be. I don't know if you want to say the form. I don't know. In the Webb case, it seemed like you came close to saying you do need that formal committee meeting. But I think you could argue back from there that if you can show the committee as a committee undertook an investigation, for example, if Dr. Painter had been asked by the surgical audit committee, Dr. Painter undertake an investigation of this case. The committee as a committee delegating to him a duty to undertake an investigation. I think you can argue, I certainly would if I was on the other side, that that's part of the process. And that if he communicated outside of the confidential information in the undertaking of that committee work that he was delegated to do by a committee,  but undisputedly that's not what we have here. There wasn't any committee process underway. Again, Dr. Painter didn't think his committee was even going to get involved. He wasn't the one ultimately that was asked to investigate the case. So I don't think there is any. That's what made me ask the question about the purpose of Dr. Kern's telephone call. Because, first of all, if we draw a line to all time before the conversation before Dr. and I don't know why I have a Dr. McGillen. The conversation with Dr. McGillen is the breach, allegedly. So let's go back before the breach. And we have to talk about the conversation between Dr. Kern and Dr. Painter. And my question is, can it reasonably be argued that this is information that's garnered between Dr. Kern and Dr. Painter in the process of peer review? Or was there another purpose for that telephone call? I just threw you a 16-inch softball. Boy, I hope I don't miss it. Chicago softball. I hope I don't miss it. Because, again, all these communications in these cases, you could argue, go to the care and the quality of care. I mean, Roche, the anesthesiology head of the department, stopped the doctor and said, what happened? What happened? Nobody got up here. What happened? And he said, well, we had a secretarial issue. There were some new secretaries on the floor. I mean, that's all trying to go to, wow, I need to know that. I'm the head of the anesthesia department. I need to know that kind of information. That's the kind of thing I need to improve the quality of our care. And the court said, well, that's all fine and good. You had that conversation. But where was the committee process? Yeah, you were the head of the committee. It turns out that guy was actually the head of the committee. But the committee, as a committee, hadn't undertaken the process yet. And so back to your question, these conversations that occurred are at best information of the medical staff. These are the medical staff communicating to each other. And that's what Roche said, hey, there's a big difference between the information available to the staff, even though it's about quality of care and so forth and reducing morbidity, and the information of the committee. Well, in your brief, Mr. Griffin, you cite this Pietro case where there's some other language we could look to, and we'll ask Mr. Cosentino about it, and that is that the Medical Studies Act does not afford confidentiality to documents or information generated before the peer review process begins, or information reported to a committee unless that information is generated by or requested by a committee. So is the pathologist calling Dr. Painter? Is she really the peer review process? Is she part of the committee? Is she generating any information for a committee or requested by a committee? I mean, I think we have to answer those questions in the negative, but I'm going to allow Mr. Cosentino to respond. Look at the Berry case where the information was a letter written by a physician who said, we've got to get this reviewed. So he writes a letter to the peer review committee saying, this is an incident, you've got to review it, and the evidence was, okay, that triggered our review. But the court said, well, wait a minute, that still took place before the committee, as a committee, undertook the process of review. And I think that is the conclusion you'll have to reach here. So I don't think they're going to get to the issue of the statute. Interesting issue, but I don't think you're going to have to reach it. Obviously, if you do, we would respectfully submit that it doesn't permit a private cause of action, certainly for a peer-reviewed physician. The purpose, obviously, of the act, and this is in the Roche case, is to improve the quality of health care of hospital and physician patients primarily.  And then secondarily, to encourage physicians to sit as peer reviewers. So a peer-reviewed physician, I would submit, is not within the class of persons the statute is intended to protect. The alleged injury is not an injury that the statute is intended to protect. There are other alternative remedies. There's a criminal sanction in the statute, Class A misdemeanor, if you do violate it. There's tort actions. Your honors weren't in the prior appeal of this case, but there is a slander action still alive, still pending in this case, so there's an alternative remedy there as well. And for those reasons, I would respectfully request that the court affirm the summary judgment on this particular count in favor of Dr. Painter. Thank you very much. Thank you, counsel. Mr. Cosentino. Thank you. I don't know what point to address in terms of importance, but I would like to address briefly this idea with regard to the conversation that took place between Dr. Kern and Dr. Painter. If, in fact, that was the genesis of the peer review process in this case, I don't think that there's any question then in any conversation that Dr. Painter as a member of the Surgical Audit Committee had with somebody outside of that committee would be a clear violation of the confidentiality set forth in the act. Whether or not the act is intended to protect Dr. Tunjian, whether there should be a private right of action is a separate matter altogether that we didn't really get to, but I would like to address briefly. I know my time is limited. I think it's clear from both the reading of the statute as well as the cases that are cited, some of which don't come from this jurisdiction, one of which I believe was a federal case that I cited to in my appellate brief. It's clear that the act was intended to protect people like Dr. Tunjian. It's not just to protect the public. It's not just to protect the people who are reviewing people like Dr. Tunjian who's sitting in the hot seat during the peer review committee. It's to protect Dr. Tunjian as well. One of the reasons that we want to keep this information confidential, as I raise in my brief, according to courts that have taken up the issue, is you want to protect doctors from malpractice actions. That's why this information should remain confidential, especially in light of the fact that the Illinois courts have narrowed the confidentiality protections to information that is generated by the committee or in furtherance of the committee's investigation. But isn't the doctor protected because of the criminal statute? No, I don't think he is. And I think that the Abbas case, which I understand was overturned for different reasons at the Illinois Supreme Court, the first district held that a criminal sanction and a civil sanction are not mutually exclusive. And in the Abbas case, you had a quasi-criminal sanction. I believe it was an ordinance violation under the Lead Poisoning Act. And in this case, you have a Class A misdemeanor for a violation of the act. To my knowledge, there has never been a criminal prosecution for a violation of the Medical Studies Act. I have seen no reported decisions that have at least made it to the appellate level, which would indicate that otherwise is the case. So I think that the criminal sanction in this case is, if anything, a toothless tiger. I don't think that it's ever been employed by any state's attorney throughout Illinois to enforce what's termed a breach of confidentiality. If the act is intended on any level to foster this free flow of information between doctors for the betterment of the public and the health care and health and welfare of the public, then the act has to be taken seriously by those people that are charged with it. People like Dr. Painter, who sit on these committees, should know that he cannot go outside of these committees and share information that's gathered. Once he knows that this is an automatic case for peer review, and he gets a call from the pathologist saying, hey, I saw something in the specimen that might be of interest, he cannot take that information to anybody outside of peer review, because what he's doing at that point is he's exposing the subject of the review to a potential claim by a plaintiff in a medical malpractice case. That's what the act is intended to protect. It's intended to protect against claims that are made based on information that should otherwise be kept confidential. Anything further? No, thank you. Thank you very much for your time. All right. This case was well-argued and well-briefed, and it will be taken under advisement.